AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
для the
District of New Hampshire

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
A SILVER APPLE IPHONE 12, ASSIGNED TELEPHONE NUMBER (978) 885-7551, CURRENTLY LOCATED AT 324 SOUTH RIVER ROAD, BEDFORD NEW HAMPSHIRE

Case No. 21-mj-53-01-AJ

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A (incorporated by reference)

located in the _____ District of New Hampshire, there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B (incorporated by reference)

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☒ evidence of a crime;
- ☒ contraband, fruits of crime, or other items illegally possessed;
- ☒ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841 | Distribution of Controlled Substances and Possession with Intent to Distribute |
| 21 U.S.C. § 846 | Conspiracy to Distribute and Possession w/ Intent to Distribute Controlled Sub. |

The application is based on these facts:
Affidavit in Support of Application for Search Warrant, attached hereto and incorporated herein.

☒ Continued on the attached sheet.
☐ Delayed notice of _____ days *(give exact ending date if more than 30 days: _____)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/ Casey T. MacDonald
*Applicant's signature*

Casey T. MacDonald, DEA Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by Telephone *(specify reliable electronic means)*.

Date: Mar 11, 2021

[Judge's signature]
*Judge's signature*

City and state: Concord, New Hampshire
Andrea K. Johnstone, United States Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| A SILVER APPLE IPHONE 12, ASSIGNED TELEPHONE NUMBER (978) 885-7551, CURRENTLY LOCATED AT 324 SOUTH RIVER ROAD, BEDFORD NEW HAMPSHIRE | Case No. 21-mj- |

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION UNDER RULE 41 FOR A
WARRANT TO SEARCH AND SEIZE**

I, Casey T. MacDonald, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. I am an investigative or law enforcement officer within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516

3. I am a Special Agent with the United States Drug Enforcement Administration ("DEA") and have been so employed since 2014. I graduated from the DEA Training Academy in Quantico, Virginia, where I received training in drug investigations, narcotics identification, search warrants, undercover techniques, surveillance, debriefing of informants, and other investigative procedures. I am currently assigned to the DEA's Southern New Hampshire High Intensity Drug Trafficking Area Task Force ("HIDTA"). Prior to joining the DEA, I served as an officer in the

Uniformed Division of the United States Secret Service for approximately four years. In addition, I hold a master's degree in criminal justice from the University of Massachusetts.

4. Based upon my training and experience, I am familiar with drug traffickers' methods of operation, including the distribution, storage, and transportation of drugs and the collection of money that constitutes the proceeds of drug trafficking activities.[1] I have worked in an undercover capacity on drug investigations. In that capacity, I have purchased controlled drugs and have also personally observed the distribution, sale, and possession of various controlled substances. I am familiar with the types of packaging used to distribute controlled substances as well as equipment used such as scales, bags, pill presses and cutting agents. I am also familiar with drug-related paraphernalia and the equipment used to ingest controlled substances, such as syringes and smoking pipes. I have talked to drug dealers and listened to their conversations, so I am familiar with the coded language often used in these conversations. Because of my training and experience, I am familiar with new trends of concealing illegal drug trafficking. I also stay current on the latest technology used to investigate drug crimes. In sum, through my training, education, and experience, I have become familiar generally with the manner in which drug traffickers conduct their illegal activities, including purchasing, manufacturing, storing, and distributing drugs, the laundering of illegal proceeds, and the efforts of persons involved in such activity to avoid detection by law enforcement.

5. I have participated in approximately seven Title III investigations in the Northeastern United States. I have been the affiant on Title III applications in two of those

---

[1] Observations made and conclusions drawn throughout this declaration that are based on my training and experience also include the training and experience of other law enforcement agents and officers with whom I have discussed these issues.

2

investigations. I have also been involved in several state wiretap investigations in Massachusetts and New Hampshire.

6. I am familiar with the facts and circumstances of this investigation from my own personal participation and from oral and written reports given to me by other DEA Agents, Task Force Officers, and members of law enforcement. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

7. The property to be searched is a silver Apple iPhone 12, with telephone number (978) 885-7551, hereinafter the "Device." Agents are not yet able to determine the serial number of the Device because the Device remains locked. The Device is currently located at South River Road, Bedford, New Hampshire in the DEA non-drug evidence vault.

8. The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

9. Based upon information obtained from a variety of sources, including confidential sources, GPS tracking devices, cell phone location information, physical surveillance, intercepted communications, and controlled purchases of drugs, I believe that Manuel Emilio Delacruz-Diaz ("DELACRUZ-DIAZ"), Danaury Espinal-Lara ("ESPINAL-LARA"), Francisco Valdez-Aybar, Santo Luis Araujo-Guerrero, Mikael Canario-Batista ("MIKEY"), Victor Tejada-Gonzalez, Edwin Flores ("PAPO"), Ramon Jacquez-Diaz ("MACHETE"), Carlos Patricio Ozuna Gonzalez, Ambiory Monegro-Reynoso ("AMBIORY"), Wandy Rosario ("ROSARIO"), Vivian LNU, Estiviz Estepan-Ortiz, Maribel Benjamin, and others are actively involved in the distribution of substantial

3

quantities of fentanyl in Massachusetts and New Hampshire. A law enforcement investigation that began in the summer of 2019 has led me to determine that these individuals are members of an organization that I have labeled the "DELACRUZ DTO." These individuals were indicted by a federal grand jury on March 8, 2021, with one count of Conspiracy to Distribute and to Possess with Intent to Distribute Controlled Substances, in violation of 21 U.S.C. §§ 846, 841(a), and (b)(1)(A)(vi).

10. During the course of this investigation, five Title III applications were made to and granted by District Court Judge Paul J. Barbadoro in the District of New Hampshire, to intercept electronic and wire communications over ten different cellular telephones. An Order dated October 20, 2020, authorized the interception of wire and electronic communications over (978) 828-4247 ("**TT-6**") a phone utilized by DELACRUZ-DIAZ. In addition to the Title III Orders, pen register trap and trace orders were obtained for WhatsApp accounts using the same number as TT-6, as well as for another phone number known to be used by DELACRUZ-DIAZ, (914) 310-6127 ("6127 Phone"). WhatsApp is an encrypted communication application that can be used to send text messages, pictures, or push-to-talk voice message over the internet.

11. During the course of this interception period, on October 21, 2020, DELACRUZ-DIAZ was intercepted over TT-6 speaking with ESPINAL-LARA about a package containing two kilograms of drugs that was being sent to "Lawrence, 01841," and specifically, "right there on Essex Street." (Session 99.) Later in the investigation, agents searched the cellular telephone of MIKEY, an individual operating a fentanyl stash house in Lawrence on behalf of ESPINAL-LARA, and found a photograph of a United States Postal Service ("USPS") receipt dated October 21, 2020, for a package sent from Phoenix, Arizona to Lawrence, Massachusetts. Further investigation determined that this package was sent by known fentanyl traffickers who

were the targets of a separate DEA investigation in Phoenix. The package was addressed to 361 Essex Street in Lawrence, Massachusetts. 361 Essex Street is the address of a business called "JP Tu Mundo."

12. According to tracking information on the package sent from Arizona, it went out for delivery on October 23, 2020. At 3:08 p.m., the USPS tracking information notes that there was no access for delivery. Between 1:59 p.m. and 4:17 p.m. on October 23, 2020, DELACRUZ-DIAZ had 84 communications using TT-6 and 6127 Phone over WhatsApp with (978) 885-7551. Agents later determined that this phone number is used by ROSARIO. As discussed below, ROSARIO eventually picked up and delivered the drug package sent from Arizona to DELACRUZ-DIAZ on November 9, 2020. I believe that this series of communications is consistent with DELACRUZ-DIAZ coordinating with ROSARIO the pickup of the package, which was being delivered to a business.

13. Ultimately this delivery was not successful, and through intercepted calls, I learned that the package would be redelivered on November 9, 2020. On November 8, 2020, several calls were intercepted between DELACRUZ-DIAZ and AMBIORY arranging the details for the delivery the following day, as well as who the incoming drugs would be sold to. At 4:42 p.m. on November 8, 2020, ROSARIO sent two messages on WhatsApp to DELACRUZ-DIAZ at TT-6. At 4:50 p.m., DELACRUZ-DIAZ was intercepted calling AMBIORY (Session 1533) and he said, "I saw this woman sent me a message. Did you speak with her?" AMBIORY responded, "Yes, well I just wrote her a message. What did she tell you?" DELACRUZ-DIAZ said, "That I didn't send her the information." After more discussion about when to send the information to the woman, when asked if he wanted it now, DELACRUZ-DIAZ told AMBIORY, "Yes of course, that way she can follow the tracking." AMBIORY ended the

conversation by telling DELACRUZ-DIAZ, "So let me send you the tracking. You'll send it to her." Pen register data shows that AMBIORY sent an image over WhatsApp to DELACRUZ-DIAZ at 4:52 p.m. DELACRUZ-DIAZ then sent an image over WhatsApp to ROSARIO at 5:41 p.m., followed by a voice note at 5:42 p.m.

14. The next day, November 9, 2020, AMBIORY called DELACRUZ-DIAZ on TT-6 (Session 1580) at12:25 p.m., while DELACRUZ-DIAZ was at a Home Depot in New Hampshire. When asked where he was, AMBIORY responded, "I'm on Essex and there is a man in a truck/van right in front that looks weird." DELACRUZ-DIAZ responded, "By the business?" and AMBIORY responded, "Yes, in front." DELACRUZ-DIAZ told him, "Okay, give me a couple of minutes." Between 12:59 p.m. and 1:16 p.m., DELACRUZ-DIAZ sent ROSARIO 5 messages over WhatsApp. At 1:17 p.m., ROSARIO sent one message back to DELACRUZ-DIAZ.

15. At 1:33 p.m., ROSARIO sent a message over WhatsApp to DELACRUZ-DIAZ. Approximately 7 minutes later, at 1:40 p.m., a blue, 2019 Honda HR-V arrived at 157 West Street in Lawrence. This location is where PAPO lives and, based upon surveillance and intercepted communications, where DELACRUZ-DTO cuts and prepares drugs for distribution. When agents ran the vehicle information of the Honda HR-V, it was learned that the vehicle was leased to ROSARIO. Based upon surveillance, ROSARIO was identified as the passenger in the H-RV. DELACRUZ-DIAZ was observed opening the rear passenger side door of the HR-V; he removed a brown box and threw it to PAPO. DELACRUZ-DIAZ then pulled out money from his pocket, and was observed counting it out in his hand. He then handed the cash to ROSARIO who was in the front passenger seat.

16. There were several subsequent communications that were intercepted between DELACRUZ-DIAZ, PAPO, and AMBIORY discussing opening up the drugs, preparing the drugs and then discussing who the drugs would go to and in which amounts. The following day, November 10, 2020, several communications were intercepted between AMBIORY and DELACRUZ-DIAZ discussing the strength of the drugs that had arrived.

17. Later in the evening on November 9, 2020, at 7:30 p.m., DELACRUZ-DIAZ was intercepted calling ROSARIO using TT-6 (Session 1685). He told her, "Tomorrow drop by to give you something more, you know, money," and, "I did not have much money, you know, earlier." DELACRUZ-DIAZ asked ROSARIO to take him to Boston the following day, but she responded, "Listen, the issue is that my license is expired. That's why I took this guy with me today." After more discussion of traveling to Boston, DELACRUZ-DIAZ told ROSARIO:

| | |
|---|---|
| DELACRUZ-DIAZ: | But I'm going to see you tomorrow regardless to give you some money. You get me? In addition, what I gave you today. |
| ROSARIO: | Uh-huh. |
| DELACRUZ-DIAZ: | Luckily everything arrived well. But do you know what you did wrong Wandy? |
| ROSARIO: | What? |
| DELACRUZ-DIAZ: | Wandy… |
| ROSARIO: | Tell me. |
| DELACRUZ-DIAZ: | Listen to my advice. If I tell you Wandy, "Do not take it." Do not take it. I'm just taking care of you. |
| ROSARIO: | I know, but you know what it was? |
| DELACRUZ-DIAZ: | There was a weird vehicle in front. |
| WANDY: | No… |
| DELACRUZ-DIAZ: | I told you, "Do not take it. Do not take it." |
| ROSARIO: | I'm going to call you by WhatsApp to explain it to you good. Hold on." |

7

18. Based on this conversation and the previous events, I believe that ROSARIO conspired with DELACRUZ-DIAZ and AMBIORY to pick up the package containing the two kilograms of fentanyl that was delivered to 361 Essex Street and delivered it to 157 West Street. I believe that DELACRUZ-DIAZ paid ROSARIO to deliver this package and indicated to her that he would pay her additional money. I believe that when AMBIORY called DELACRUZ-DIAZ to tell him about the suspicious truck out front of 361 Essex Street, DELACRUZ-DIAZ messaged ROSARIO to tell her not to pick up the package because he was worried that law enforcement might be setting up the delivery. ROSARIO told DELACRUZ-DIAZ that it was not an issue and then offered to explain over WhatsApp.

19. Between October 12, 2020, and March 4, 2021, ROSARIO sent or received 568 messages to DELACRUZ-DIAZ over WhatsApp. I believe that ROSARIO is a regular drug courier for DELACRUZ-DIAZ and will deliver drugs to locations at his direction in exchange for payment.

20. ROSARIO was arrested on March 10, 2021. At the time of her arrest, she had a cellular telephone in her possession. Agents with the DEA called telephone number (978) 885-7551, which is the same number intercepted over the Title III wire and the WhatsApp pen register communicating with DELACRUZ-DIAZ, and the phone in the possession of ROSARIO at the time of her arrest began ringing.

21. Based on the facts set forth in this affidavit, I submit that there is probable cause to believe, and I do believe, that violations of 21 U.S.C. §§ 846 and 841 (conspiracy to distribute and possess with intent to distribute controlled substances) have been committed by ROSARIO, DELACRUZ-DIAZ and others known and unknown. I submit that there is probable cause to

believe, and I do believe, that the information described in Attachment B will constitute evidence of these criminal violations.

22. The Device is currently in the lawful possession of the DEA. It came into the DEA's possession in the following way: The cellular phone was seized incident to arrest when the defendant was arrested on March 10, 2021, on a warrant issued after her indictment on one count of conspiracy to distribute and possess with intent to distribute a controlled substance, fentanyl. Therefore, I seek this additional warrant out of an abundance of caution to be certain that an examination of the Device will comply with the Fourth Amendment and other applicable laws.

23. The Device is currently in storage at 324 South River Road, Bedford, New Hampshire. In my training and experience, I know that the Device has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of the DEA.

## TECHNICAL TERMS

24. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I use the following technical terms to convey the following meanings:

   a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and

from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or

miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media

include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

25. Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online at http://www.appl.com/iphone-12/specs/, I know that the Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, PDA, and to access the internet. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, evidence of communications between the users and others, and location information, and other data that may be evidence of conspiracy to distribute and possess with intent to distribute controlled substances.

**ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

26. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the

Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

27. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

   b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

   d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual

13

information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

28. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

29. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## **CONCLUSION**

30. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

I declare that the foregoing I true and correct.

                                                                                      _____
                                                                                      Casey T. MacDonald, Special Agent
                                                                                      United States Drug Enforcement
                                                                                      Administration

Subscribed and sworn to before me   Via telephonic conference
on March 11, 2021:

*[signature]*
_____
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

The property to be searched is a silver Apple iPhone 12, with telephone number (978) 885-7551, hereinafter the "Device." Agents are not yet able to determine the serial number of the Device because the Device remains locked. The Device is currently located at South River Road, Bedford, New Hampshire in the DEA non-drug evidence vault.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1.  All records on the Device described in Attachment A that relate to violations of **21 U.S.C. §§ 841 and 846,** and involve **Wandy Rosario** since **October 12, 2020,** including:

    a.  Information associated with drug trafficking, including pay-owe sheets, buyer lists, telephone lists, address books, seller lists, ledgers, records of sales, records of expenditures made to purchase controlled substances, and records of expenditures to purchase products which are used in the distribution of controlled substances

    b.  lists of customers and related identifying information;

    c.  types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

    d.  any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

    e.  any information recording **Wandy Rosario**'s schedule or travel from **October 12, 2020** to the present;

    f.  information reflecting contact or communication with coconspirators, the distribution of controlled substances to coconspirators, and the disposition of proceeds of controlled substances (including within messaging applications like WhatsApp, Snapchat, and Instagram stored on the phone);

    g.  all bank records, checks, credit card bills, account information, and other financial records.

2. Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.